IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRACY E. RUSSELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-77 Erie |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Tracy E. Russell, seeks judicial review of a

decision of Defendant, Commissioner of Social Security ("the

Commissioner"), denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under

Titles II and XVI, respectively, of the Social Security Act, 42

U.S.C. §§ 401-433 and §§ 1381-1383f.¹ Presently before the Court

are the parties' cross-motions for summary judgment pursuant to

Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's

motion for summary judgment will be granted, and the

Commissioner's cross-motion for summary judgment will be denied.

---

¹The Social Security system provides two types of benefits
based on an inability to engage in substantial gainful activity:
the first type, SSI, provides benefits to disabled individuals
who meet low-income requirements regardless of whether the
individuals have ever worked or paid into the Social Security
system, and the second type, disability insurance, provides
benefits to disabled individuals who have paid into the Social
Security system. Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.
1999).

## II.  Background

### A.   Factual Background

Plaintiff, who was born on October 13, 1961, completed the 11th grade.  In 1988, she obtained a General Equivalency Diploma ("GED").[2]  (Certified Copy of Record before the Social Security Administration, "R." at 40-41).  In the past, plaintiff has been employed as an assembly line worker in two factories, a desk clerk for a Holiday Inn Express,[3] a personal care provider in a

---

[2]Regarding Plaintiff's education, a January 30, 2001 report in the administrative record in this case, which is captioned "Medical Review Team Disability Certification," indicates that Plaintiff attended special education classes until she withdrew from school at age 16, and that she did not obtain a GED on the first attempt.  The report also states that Plaintiff "could likely handle a therapeutic work environment but competitive employment is beyond her capabilities leading to further distress & decompensation."  (R. 250).  Similarly, a vocational report completed by Action Review Group, Inc. on February 7, 2001 in connection with Plaintiff's earlier applications for DIB and SSI states that Plaintiff "is clearly unfit and unable to perform any substantial gainful activity" taking into account her age, education, the non-exertional limitations created by her psychiatric dysfunction and the exertional limitations which may result from her physical problems.  (R. 256).  These reports predate the onset date of disability alleged in Plaintiff's current applications for DIB and SSI.

[3]With respect to Plaintiff's employment as a desk clerk for a Holiday Inn Express, Plaintiff testified in this case that she held this job for only a few months in 1998 because she was unable to grasp the computer skills required to perform the job.  (R. 42, 55).

2

private home, and a nurse's aide in several nursing homes.[4] She has not worked since June 1999. (R. 41- 43, 260).

In an Adult Disability Report completed on January 21, 2002, Plaintiff indicated that she became unable to work in June 1999 due to depression, anxiety, panic attacks and a learning disability. (R. 258-67). Regarding the manner in which Plaintiff's mental impairments limit her ability to work, Plaintiff indicated that she has difficulty leaving her home because she gets very upset and nervous.[5] (R. 259-67).

## B. Procedural History

Plaintiff initially filed applications for DIB and SSI on November 30, 2000, alleging disability since June 8, 2000 due to panic and anxiety attacks, depression and a learning disability. Plaintiff's applications were denied initially and upon reconsideration. She then requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held before

---

[4]As to Plaintiff's past employment as a nurse's aide, the January 30, 2001 report completed by the Medical Review Team in connection with Plaintiff's earlier applications for DIB and SSI states: "[Plaintiff] managed to complete nurse's aide training with significant difficulty and has been terminated on several occasions due to her inability to maintain pace & perform adequately." (R. 250).

[5]At the time of the alleged onset on her disability, Plaintiff was employed by Prism Technology as a factory worker inspecting car parts. Plaintiff claims that her fear of leaving the house resulted in the termination of this employment in June 1999 due to excessive absenteeism and also interfered with her previous employment. (R. 42, 44, 55).

3

ALJ David J. Kozma on September 5, 2001.  On November 19, 2001,
ALJ Kozma issued a decision denying Plaintiff's applications for
DIB and SSI.  Specifically, ALJ Kozma found that despite severe
impairments, *i.e.*, an affective disorder and an anxiety disorder,
Plaintiff retained the residual functional capacity ("RFC") to
perform low stress work activity, including the jobs of a
cleaner, security guard and packer.[6]  (R. 80-82, 94-103, 104-13,
194-96, 207-14).  Plaintiff requested review of ALJ Kozma's
November 19, 2001 decision.  (R. 33).  However, the request was
denied by the Appeals Council on October 21, 2002.  (R. 29-30).

On March 6, 2002, prior to the denial of her request for
review of ALJ Kozma's November 19, 2001 decision, Plaintiff filed
new applications for DIB and SSI.  In these applications,
Plaintiff alleged disability since January 22, 2002 due to panic
and anxiety attacks, depression and a learning disability.  (R.
6, 232-34, 259).  Following the denial of Plaintiff's second
applications for DIB and SSI on June 19, 2002, she requested a
hearing before an ALJ.  (R. 217-22).  At the hearing, which was
held before ALJ James Bukes on July 13, 2004, Plaintiff, who was
represented by counsel, and a vocational expert ("VE") testified.
(R. 37-62).

---

[6]Under the Social Security Regulations, RFC is defined as
the most a claimant can still do despite his or her limitations.
20 C.F.R. § 404.1545.

4

On December 23, 2004, ALJ Bukes issued a decision denying
Plaintiff's second applications for DIB and SSI. Specifically,
ALJ Bukes concluded that Plaintiff retained the RFC to perform
medium work with certain non-exertional limitations which existed
in significant numbers in the national economy.[7]  (R. 15-26).
Plaintiff requested review of ALJ Bukes' December 23, 2004
decision.  However, the request was denied by the Appeals Council
on January 24, 2006, rendering ALJ Bukes' decision the final
decision of the Commissioner.  (R. 7-9).  This appeal followed.

## C. Medical and Psychological Evidence

On October 4, 2000, Plaintiff underwent a neuropsychological
evaluation by Martin Meyer, Ph.D. and Julie Uran, Ph.D. for the
Office of Vocational Rehabilitation, which included various
tests.  (R. 136-44).  With respect to the Wechsler Adult
Intelligence Scale-III ("WAIS-III"), the evaluation report
indicates that Plaintiff's intellectual and cognitive abilities

---

[7]With regard to ALJ Bukes' RFC determination, the Social
Security Regulations define medium work as work involving lifting
no more than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds, 20 C.F.R.
§ 404.1567(b), and ALJ Bukes described Plaintiff's non-exertional
limitations as follows: "perform only simple, routine tasks;
avoid working closely with others; avoid crowded places; avoid
intensive supervision; avoid changes in the work setting; avoid
travel to unfamiliar places; avoid the general public; can read
(sic) at only a 4th grade level; must avoid a high degree of
dexterity; must avoid rapid hand movement; avoid decision-making;
and avoid work requiring completing work on a pro rate basis."
(R. 23).

were in the borderline range.[8]  (R. 138).  As to the results of

the achievement tests, the evaluation report indicates that

Plaintiff demonstrated an 8th grade level reading ability, a 6th

grade level spelling ability and a 4th grade level math ability.

(R. 138).  The evaluators' summary of the diagnostic findings

included the following: (1) with respect to Plaintiff's

personality assessment,[9] "significant emotional distress is

suggested with symptomology including depression, anxiety,

agoraphobia, difficulties involving anger modulation and

negligible esteem;" and (2) regarding Plaintiff's

neuropsychological testing, "[t]he impairment index obtained was

considered within the serious range of impairment in comparison

to a population of brain damaged individuals," "information

processing difficulties are specific to tactile, auditory and

visual skills," "dexterity is impoverished," "attentional

processes are weak," "in addition to borderline intellect,

learning disorder is diagnosed specific to mathematics," "most

aspects of memory appear intact, although area of difficulty

_____

[8]Plaintiff received the following scores on the WAIS-III:
Verbal IQ - 80, Performance IQ - 77, and Full-Scale IQ - 77.  (R.
138)

[9]Among the tests administered to Plaintiff to assess her
personality was the Minnesota Multiphasic Personality Inventory -
2 ("MMPI-2").  In connection with Plaintiff's personality
assessment and its significance with regard to Plaintiff's
ability to engage in substantial gainful activity, the evaluators
noted that "[v]ocational success would be contingent on further
emotional stability."  (R. 140).

6

includes working memory," and "abilities for higher level
cognitive processes to include categorical thinking, simultaneous
information processing and non-verbal problem solving are
impoverished."[10]   The evaluators assigned a score of 55 to
Plaintiff on the Global Assessment of Functioning ("GAF")
Scale.[11]   (R. 140-41).

     The records of Dr. Luis Gomez, Plaintiff's family physician,
which are in the administrative record in this case cover the
period from December 2001 to February 2004.[12]   These records show
that Dr. Gomez treated Plaintiff for various medical conditions
over the years, including a cough and runny nose in late 2001 (R.
348); a swollen left leg in February 2002 (R. 352); signs of
premenopausal depression and hot flashes and an ovarian cyst in

---

[10]The evaluators' recommended vocational domains for
Plaintiff were ticket taking and food tray delivery, although, as
noted in footnote 9, the evaluators opined that Plaintiff's
vocational success was contingent on her attainment of "further
emotional stability."  (R. 140, 142).

[11]The GAF Scale considers psychological, social, and
occupational functioning on a hypothetical continuum of mental
health - illness.  The highest possible score is 100, and the
lowest is 1.  GAF scores between 50 and 60 denote **moderate
symptoms** (e.g., flat affect and circumstantial speech, or
occasional panic attacks) **OR moderate difficulty in social,
occupational, or school functioning** (e.g., "few friends or
conflict with peers or co-workers").  Diagnostic and Statistical
Manual of Mental Disorders (DSM IV), at 30-32 (bold face in
original).

[12]Dr. Gomez's primary specialty is family medicine.  His
secondary specialty is emergency medicine.  (R. 334).

7

May and June 2002 (R. 348, 350-51); a sty on her eye in May 2003 (R. 349); right ear pain in August 2003 (R. 339); chest pain in November 2003 (R. 337); and gynecological problems in February 2004.[13]   (R. 349).

On March 26, 2002, Dr. Gomez completed a mental health questionnaire concerning his treatment of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. In the questionnaire, Dr. Gomez indicated that he began treating Plaintiff in March 1992, and that he had last seen Plaintiff in November 2001.[14]   Dr. Gomez indicated that Plaintiff suffers from mood swings and panic attacks when she leaves the house and that she is "sometimes depressed."  Dr. Gomez indicated that Plaintiff had discontinued taking Paxil and was taking 20 mg. of Prozac.[15] With respect to Plaintiff's social situation, Dr. Gomez indicated that he thought she lived with her kids.  (R. 292).  As to mental status, Dr. Gomez described Plaintiff as "normal" in all areas

---

[13]Dr. Gomez's records corroborate Plaintiff's testimony at the hearing before ALJ Bukes that she sees the doctor "[n]ot very often at all."  (R. 51).

[14]Dr. Gomez described the frequency of Plaintiff's visits as "when necessary."  (R. 292).

[15]Prozac is prescribed for depression, obsessive-compulsive disorder and panic attacks, and Paxil is prescribed for depression, panic disorders and social anxiety disorders.  See www.nlm.nih.gov/medlineplus/druginformation.html (last visited June 14, 2007).  With respect to the change in Plaintiff's prescribed medication from Paxil to Prozac, Plaintiff testified at the hearing before ALJ Bukes that the Paxil made her sick. (R. 52).

8

with the exception of mood, which he described as "sometimes nervous."[16]   (R. 293-94).   Dr. Gomez also indicated that Plaintiff did not demonstrate difficulties in activities of daily living, social functioning or concentration, persistence and pace.   Finally, Dr. Gomez indicated that Plaintiff's medication "seems to help."[17]   (R. 294-95).

Plaintiff is under the care of a psychiatrist, Dr. Tariz Qureshi.[18]   On March 26, 2002, Dr. Qureshi was asked to complete the same mental health questionnaire concerning his treatment of

_____

[16]The areas of Plaintiff's mental status which Dr. Gomez described as normal included appearance, behavior and psychomotor activity, characteristics of speech, affective expression, appropriateness, hallucinations and illusions, depersonalization and derealization, stream of thought, content of thought, information and intelligence, concentration, orientation to time, place and person, memory, impulse control, judgment and insight. (R. 293-94).

[17]Dr. Gomez completed an identical mental health questionnaire at the request of the Pennsylvania Bureau of Disability Determination on December 12, 2000 in connection with Plaintiff's initial applications for DIB and SSI.   In that questionnaire, Dr. Gomez indicated that he began treating Plaintiff in March 1992; that he had last seen her in August 2000; that Plaintiff's diagnosis was anxiety and he saw her "when necessary"; that Plaintiff had been experiencing panic attacks for several months when she had to leave her house; that Plaintiff was taking 20 mg. of Prozac for her anxiety; that Plaintiff lived "with [her] kid" regarding her social situation; that Plaintiff's mental status was normal; that he had no knowledge of Plaintiff's activities of daily living; and that Plaintiff needed to see a psychiatrist if her condition worsened. With respect to social functioning and concentration, persistence and pace, Dr. Gomez did not complete the questionnaire.   (R. 160-64).

[18]Plaintiff also sees a therapist, Rosemary Buzzer, "every couple of months."   (R. 49-50).

9

Plaintiff that Dr. Gomez had been asked to complete by the
Pennsylvania Bureau of Disability Determination.   In the
questionnaire, Dr. Qureshi indicated that he first saw Plaintiff
on March 7, 2001 and that he had last seen her on March 20,
2002.[19]   Dr. Qureshi described Plaintiff's diagnosis as panic
disorder with agoraphobia,[20] indicating that he sees Plaintiff
every 2 to 3 months.   Dr. Qureshi also indicated that Plaintiff
was taking Celexa (40 mg.) and Vistaril (50 mg. twice a day) for
her mental impairments.[21]   With respect to Plaintiff's social

---

[19]With respect to Dr. Qureshi's indication that he first saw
Plaintiff on March 7, 2001, it appears that this is the date on
which he first saw Plaintiff at UPMC Behavioral Health.   The
administrative record in this case contains the report of a
psychological evaluation of Plaintiff which was performed by Dr.
Qureshi on October 19, 2000 at Bethesda Community Care.   The
report indicated that Plaintiff had been started on Paxil by her
family physician, Dr. Gomez, who had referred her to Bethesda
Community Care for the psychological evaluation due to panic
attacks of several months' duration which were worsening, fear of
going into crowds and depression.   Dr. Qureshi's diagnoses
included panic disorder with agoraphobia and depressive disorder,
not otherwise specified, and his treatment plan for Plaintiff
included the continuation of Prozac (40 mg.), the addition of
Buspar (15 mg. twice a day) for anxiety and individual
psychotherapy.   (R. 157-58).

[20]With respect to Plaintiff's history and clinical course,
Dr. Qureshi indicated that her condition results in palpitations,
trembling, shakiness, chest discomfort, dizziness,
lightheadedness and fear of going into crowded places.   (R. 298).

[21]Celexa is prescribed to treat depression, and Vistaril is
prescribed to treat, among other things, anxiety.   See
www.nlm.nih.gov/medlineplus/druginformation.html (last visited
June 14, 2007).   Regarding the change in Plaintiff's medication
from Prozac to Celexa, she testified at the hearing before ALJ
Bukes that Prozac had "a very, very bad effect on [her]."   (R.
51).

10

situation, Dr. Qureshi indicated that she lived independently.
(R. 298).  As to mental status, Dr. Qureshi described Plaintiff's
behavior and psychomotor activity as "anxious, nervous," her
characteristics of speech as "pressured," her mood as "anxious &
depressed," her information and intelligence as "average," her
concentration as "poor," and her immediate retention and recall
as "fair."  Dr. Qureshi also indicated that Plaintiff's panic
attacks may cause depersonalization and derealization; that
Plaintiff was impulsive and unpredictable and that Plaintiff
suffered from panic attacks 2 to 3 times a week.   (R. 299-300).
Dr. Qureshi indicated that, although Plaintiff did not
demonstrate difficulties in activities of daily living, she did
demonstrate difficulties in social functioning and with respect
to concentration, persistence and pace due to fearfulness and
panic attacks.   Finally, Dr. Qureshi described Plaintiff's
response to treatment as "fair," and her prognosis as "guarded."
(R. 301-02).

     On March 26, 2002, Dr. Qureshi also completed a medical
assessment of Plaintiff's ability to perform work-related mental
activities.   Dr. Qureshi rated Plaintiff's ability as "Poor/None"
in the following areas: Making Occupational Adjustments: deal
with the public, interact with supervisor(s), deal with work
stresses, maintain attention/concentration; Making Personal-

11

Social Adjustments: behave in an emotionally stable manner.[22]   In
the following areas, Dr. Qureshi rated Plaintiff's ability as
"Fair": Making Occupational Adjustments: follow work rules,
relate to co-workers, function independently; Making Performance
Adjustments: understand, remember and carry out simple job
instructions; Making Personal-Social Adjustments: relate
predictably in social situations.[23]   (R. 303-05).

     On May 29, 2002, Plaintiff underwent a consultative
psychological evaluation by Michael Mercatoris, Ph.D., at the
request of the Pennsylvania Bureau of Disability Determination.
In his report of the evaluation, Dr. Mercatoris noted that
Plaintiff gave her own history of depression and anxiety, and
that the history "was thought to be a reasonably reliable
impression." (R. 306).  Following Plaintiff's mental status
examination, Dr. Mercatoris described his diagnoses as follows:

DIAGNOSES:

The claimant shows characteristics consistent with major
depression, recurrent without psychotic symptoms.  She also
shows characteristics of panic disorder with agoraphobia.
She shows characteristics of posttraumatic stress disorder
as well.[24]  Prognosis for this young woman is guarded.

---

[22]A rating of "Poor/None" means "No useful ability to
function in this area."  (R. 303).

[23]A rating of "Fair" means "Ability to function in this area
is seriously limited, but not precluded."  (R. 303).

[24]Dr. Mercatoris's diagnosis of posttraumatic stress disorder
relates to Plaintiff's marriage to "an extremely abusive
alcoholic."  Plaintiff told Dr. Mercatoris that she associates

12

(R. 312).

Dr. Mercatoris concluded his report as follows: "[Plaintiff] would not be able to maintain regular attendance. Between her depression and her panic disorder, she has lost two jobs due to non-attendance." (R. 313).

Dr. Mercatoris also completed a medical assessment of Plaintiff's ability to perform work-related mental activities in conjunction with his consultative psychological evaluation of Plaintiff. Dr. Mercatoris rated Plaintiff's ability as "Poor/None" in the following areas: Making Occupational Adjustments: deal with the public; Making Performance Adjustments: understand, remember and carry out complex job instructions. In the following areas, Dr. Mercatoris rated Plaintiff's ability as "Fair": Making Occupational Adjustments: follow work rules, relate to co-workers, use judgment, interact with supervisor(s), deal with work stresses, maintain attention/concentration; Making Performance Adjustments: understand, remember and carry out detailed, but not complex job instructions; Making Personal-Social Adjustments: behave in an

---

this relationship with the onset of her depression, indicating that she has significant flashbacks and nightmares. (R. 307).

emotionally stable manner, relate predictably in social situations, demonstrate reliability.[25]   (R. 314-15).

On June 13, 2002, Manella Link, Ph.D., a state agency consultant, completed a Psychiatric Review Technique form in connection with Plaintiff's applications for DIB and SSI based on a review of her file.  Dr. Link indicated that Plaintiff was mildly restricted in activities of daily living; that Plaintiff had moderate difficulties in social functioning and with respect to concentration, persistence and pace; and that there was insufficient evidence of repeated episodes of decompensation. (R. 316-33).  On the same date, Dr. Link completed a Mental RFC Assessment in which he indicated that Plaintiff was moderately limited in various abilities relating to the mental activities of Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation.  In all other abilities relating to these mental activities, Dr. Link indicated that Plaintiff was not significantly limited.

On December 9, 2002, Dr. Qureshi performed a psychiatric evaluation of Plaintiff to update the earlier psychiatric evaluation of Plaintiff which he had performed at Bethesda

_____

[25]As noted in footnotes 22 and 23, a rating of "Poor/None" means a claimant has no useful ability to function in this area, and a rating of "Fair" means a claimant's ability to function in this area is seriously limited, but not precluded.

14

Community Care on October 19, 2000,[26] and to complete an initial psychiatric evaluation of Plaintiff for UPMC Behavioral Health. (R. 370-71). In his report of the December 9, 2002 psychiatric evaluation, Dr. Qureshi described the onset of Plaintiff's anxiety and panic disorder, the medications she had been prescribed over the course of several years, and her current medications. Dr. Qureshi noted that Plaintiff continued to complain of "depressed mood, tiredness, sleeping too much and panic attacks,"[27] and that Plaintiff remained "fearful of going out in crowded places although there is slight improvement in her depression." (R. 370). Dr. Qureshi also noted that Plaintiff's mood was depressed, her affect was blunt, and she had most of the vegetative signs of depression and most of the symptoms of panic disorder with agoraphobia. Dr. Qureshi's diagnoses were "Major Depressive Disorder recurrent severe without psychotic features," and "Panic Disorder with Agoraphobia," and he assigned a GAF score of 55 to Plaintiff. Dr. Qureshi indicated that Plaintiff's dosage of Celexa had been increased to 60 mg. daily; that she

---

[26]See footnote 19.

[27]With respect to Plaintiff's complaints to Dr. Qureshi concerning tiredness, Plaintiff testified at the hearing before ALJ Bukes that the pills she takes for depression and anxiety make her "very tired, lethargic and out of it...." (R. 45). Plaintiff also testified that the sleeping pill she takes causes memory loss. (R. 46).

15

would continue taking Xanax as needed;[28] and that she would
continue individual psychotherapy.  (R. 371).

Following a Medication Management Visit ("MMV") on March 27,
2003, Dr. Qureshi noted that Plaintiff's state of anxiety was
severe; that her mood was anxious; that her behavior was
irritable; that her content of thought contained phobias; that
her motor activity was increased; and that she had insomnia.  Dr.
Qureshi also noted that Plaintiff continued to suffer from panic
attacks although they were "relieved somewhat" by her medication,
and he assigned a GAF score of 55 to Plaintiff.[29]  (R. 366-67).

---

[28]Xanax is prescribed to treat anxiety disorders and panic
attacks.  See www.nlm.nih.gov/medlineplus/druginformation.html
(last visited June 14, 2007).

[29]Dr. Qureshi's records include a letter from Patricia
Sipple, an Administrative Case Manager with Crawford County's
Mental Health Base Service Unit, to Phyllis Miller, a Disability
Advocate with the Crawford County Assistance Office, which is
dated February 28, 2003.  The purpose of the letter was to
clarify Plaintiff's mental health status and to assess her
ability to obtain and retain gainful work activity.  The letter
states in pertinent part:

"While Tracy is able to meet basic needs such as cooking,
cleaning, and adequate hygiene, her activities of daily
living are severely hampered due to her fear of leaving her
home.  Often, when she forces herself to leave her
apartment, she suffers from a panic attack and her
concentration is impaired.  As a result, Tracy could not
consistently engage in work related activity or fulfill job
expectations required in maintaining gainful employment.
While Tracy has been compliant with mental health services,
overcoming her anxiety enough to attend scheduled
appointments, it is unlikely that her condition will
significantly improve in the foreseeable future."

(R. 368-69).

16

Following a MMV on May 22, 2003, Dr. Qureshi noted that Plaintiff's state of anxiety was mildly elevated, and that Plaintiff was stable on her current medication regimen. Dr. Qureshi assigned a GAF score of 55 to Plaintiff.[30] (R. 364-65).

On July 12, 2003, Dr. Qureshi completed a medical source statement of Plaintiff's ability to perform work-related mental activities. Dr. Qureshi noted that Plaintiff has a long history of panic disorder with agoraphobia, and he opined that panic attacks and fearfulness prevent Plaintiff from working. Dr. Qureshi also noted that Plaintiff was markedly limited in the following areas: (1) the ability to understand, remember and carry out short, simple instructions; (2) the ability to make judgments on simple work-related decisions; (3) the ability to interact appropriately with the public, supervisors and co-workers; (4) the ability to respond appropriately to work pressures in a usual setting; and (5) the ability to respond appropriately to changes in a routine work setting. (R. 361-62).

Following a MMV on November 6, 2003, Dr. Qureshi noted that Plaintiff continued to exhibit depressive symptoms and have panic attacks. Dr. Qureshi indicated that Plaintiff's mood was depressed; that her sleep was affected; that her concentration

---

[30]In a treatment update report dated May 25, 2003, Dr. Qureshi noted that Plaintiff continued to complain of anxiety, depression and panic attacks. He described Plaintiff's mood as anxious and her concentration as fair. (R. 363).

17

was poor; and that her thought process included paranoia.   He described Plaintiff's prognosis as "fair."   (R. 359).   Following a MMV on January 2, 2004, Dr. Qureshi noted that Plaintiff was minimally depressed, and that her sleep and concentration were "fair."   (R. 358).   Following a MMV on March 25, 2004, Dr. Qureshi noted that Plaintiff was doing well on her current medications, but that her mood was depressed and anxious and her concentration was "fair."   (R. 357).

On July 12, 2004, Dr. Qureshi wrote a letter to Plaintiff's counsel which stated in pertinent part:

"Tracy Russell has a long history of Major Depression, recurrent and Panic Disorder with agoraphobia.   When she was initially seen she gave a history of palpitations, trembling, shaking, sweating, chest discomfort, feeling of dizziness, and unable to go out in public places.   She also complained of depressed mood, irritability, excessive crying, low frustration, and fearful of driving.   She complained of diminished concentration and lack of concentration.   She has been treated with Celexa 40 mg daily, which is an antidepressant and Xanax 0.5 mg tidprn for anxiety.   She is still fearful and anxious about going out in crowded places although she has improved but in our opinion she is unable to hold any type of gainful employment due to her panic attacks, fearfulness, and disorganized thinking."

(R. 353).

### III.   Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the

district court of the United States for the judicial district in which the individual resides. Based upon the pleadings and the transcript of the record, the district court has the power to enter a judgment affirming, modifying or reversing the Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

Determining whether substantial evidence exists is not merely a quantitative exercise. "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000), *citing* Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983); Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir.1986).

19

"Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *Id*.

## IV. Legal Analysis

### A. The ALJ's Decision

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure an ALJ must follow in evaluating a claim for Social Security disability benefits, stating in relevant part:

\* \* \*

20

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

21

*    *    *

220 F.3d at 118-19.

With respect to ALJ Bukes' application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, ALJ Bukes found
that Plaintiff had not engaged in substantial gainful activity
since her alleged onset date of disability, and the medical
evidence established that Plaintiff suffers from borderline
intellectual functioning, depression and an anxiety disorder,
which are severe impairments.  (R. 17).  Turning to step three,
ALJ Bukes found that Plaintiff's impairments were not
sufficiently severe to meet or equal the requirements of Listings
12.04, 12.05 or 12.06 in 20 C.F.R., Pt. 404, Subpt. P, App. 1,
relating to Affective Disorders, Mental Retardation and Anxiety
Related Disorders, respectively.  (R. 17).  As to step four, ALJ
Bukes found that Plaintiff cannot perform her past relevant work
due to her mental impairments.  (R. 23).  Finally, regarding step
five, based on the testimony of the VE, ALJ Bukes found that,
considering Plaintiff's age, education, past work experience and
RFC, there were a significant number of jobs in the national
economy which Plaintiff could perform, including the jobs of
cleaner, packer and assembler.  (R. 23).

22

## **B. Plaintiff's Arguments**

Plaintiff raises essentially four arguments in support of her motion for summary judgment.  First, Plaintiff asserts that ALJ Bukes' credibility determination was erroneous and not supported by substantial evidence.  Second, Plaintiff asserts that ALJ Bukes erred by failing to give controlling weight to the opinion of her treating psychiatrist, Dr. Qureshi, in accordance with 20 C.F.R. § 404.1527(d)(2).  Third, Plaintiff asserts that the ALJ based his decision on "selective application of medical evidence" and failed to address certain evidence in the record. Fourth, Plaintiff asserts that the hypothetical question posed to the VE by ALJ Bukes failed to set forth all of the limitations resulting from her mental impairments, and, therefore, the VE's response to the hypothetical question does not constitute substantial evidence supporting ALJ Bukes' adverse decision.

i

Turning first to the issue of Plaintiff's credibility, in his December 23, 2004 decision, ALJ Bukes found that Plaintiff was "less than credible" with respect to her claim of disabling mental impairments for the following reasons:

(a) in the November 19, 2001 decision which was rendered in connection with Plaintiff's initial applications for DIB and SSI, ALJ Kozma found that Plaintiff engaged in a "wide variety" of activities of daily living;

23

(b) Plaintiff has never been psychiatrically hospitalized or complained of hallucinations or delusions;

(c) Plaintiff has not taken her prescribed medications at times;

(d) Plaintiff appeared to be processing her applications for DIB and SSI for secondary gain;

(e) Plaintiff appeared less than motivated to work as evidenced by the fact that she was fired from her employment in 1999;

(f) Plaintiff appeared to be a malingerer; and

(g) the limitations alleged by Plaintiff were not supported by the sporadic treatment she had received for her depression and panic attacks.

(R. 21-22).

After consideration, the Court agrees with Plaintiff that ALJ Bukes' credibility determination was tainted by legal error and otherwise not supported by substantial evidence in the administrative record in this case.

Regarding ALJ Bukes' reliance on the earlier adverse decision of ALJ Kozma to find that Plaintiff was "less than credible," the relevant section of the decision states: "The Administrative Law Judge notes that the claimant appears able to engage in a wide variety of activities of daily living including cooking, taking care of her child, cleaning the house, doing

laundry, grocery shopping, paying bills, taking out the trash, driving, taking public transportation alone and not requiring assistance with personal needs." (R. 210). In support of this finding, ALJ Kozma cites Exhibit 5E, which is a Daily Activities Questionnaire completed by Plaintiff on December 8, 2000. (R. 122-31). As an initial matter, the Court notes that ALJ Kozma's description of Plaintiff's responses to the Daily Activities Questionnaire completed on December 8, 2000 is not entirely accurate. For example, with respect to shopping, Plaintiff reported that shopping is sometimes a problem due to panic attacks and her tendency to get claustrophobic in crowded places; with respect to driving, Plaintiff reported that she only drives when she has to because of panic attacks; with respect to cooking, Plaintiff reported that she is sometimes too tired to cook; and, with respect to cleaning the house, Plaintiff reported that she sleeps a lot when she is depressed and sometimes does not care for her house.[31] In addition, the Court notes that (1)

---

[31]With respect to activities of daily living, ALJ Kozma also failed to address Plaintiff's claim that she rested 3 to 4 hours between activities, and that she napped twice a day. (R. 123, 125). In this regard, the Court notes that "it is well established that sporadic or transitory activity does not disprove disability." Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir.1981); see also Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir.2001)("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled.").

ALJ Kozma's decision was rendered on November 19, 2001 in

connection with Plaintiff's initial applications for DIB and SSI

alleging an onset date of disability of June 8, 2000, and the

onset date of disability alleged in Plaintiff's current

applications for DIB and SSI is January 22, 2002; (2) Plaintiff

testified at the hearing in connection with her current

applications for DIB and SSI that, despite regular treatment, her

mental impairments have gotten progressively worse (R. 43); and

(3) in the Daily Activities Questionnaire completed by Plaintiff

in connection with her current applications for DIB and SSI in

March 2002, Plaintiff reported more restrictions on her

activities of daily living than she reported in the December 8,

2000 Daily Activities Questionnaire.[32]   (R. 281-85).  Based on

the foregoing, the Court concludes that ALJ Bukes erred in

relying on ALJ Kozma's finding regarding Plaintiff's range of

daily activities to conclude that she was "less than credible" in

connection with her current applications for DIB and SSI.

   With respect to ALJ Bukes' reliance on the absence of

evidence of psychiatric hospitalizations and complaints of

hallucinations or delusions to find that Plaintiff was "less than

---

[32]For example, in the March 2002 Daily Activities
Questionnaire, Plaintiff reported that she does not have the
energy to bathe or get dressed at times and she does not care;
that her cooking is limited to quick meals, such as frozen pizza
and canned ravioli; and that she can no longer take public
transportation due to nervousness.  (R. 281-82).

credible," a claimant may establish a severe mental impairment precluding substantial gainful activity in the absence of psychiatric hospitalizations, hallucinations or delusions. <u>See</u>, <u>e.g.</u>, <u>Worzalla v. Barnhart</u>, 311 F.Supp.2d 782 (E.D.Wis.2004) (There is no requirement in a Social Security disability benefits case that a claimant require hospitalization in order to demonstrate a severe mental impairment). Thus, the absence of evidence of psychiatric hospitalizations, hallucinations or delusions does not support ALJ Bukes' credibility determination.

As to ALJ Bukes' findings that Plaintiff was "less than credible" because she had not taken her prescribed medications at times and because she appeared to be malingering, ALJ Bukes cites page 9 of Exhibit B-6 F in support of these findings. However, page 9 of Exhibit B-6 F is a report of lab tests ordered by Dr. Gomez for Plaintiff in March 2003 and provides no support for these findings. Moreover, the Court's thorough review of the administrative record in this case fails to reveal any notation in a medical record that Plaintiff had stopped taking her medications for depression and anxiety which have been prescribed regularly since 2000 when Plaintiff initially complained of depression and panic attacks to her family physician, Dr. Gomez.[33]   (R. 157, 292, 298, 348-49, 353-56, 370, 373).

---

[33]In this connection, the Court also notes Plaintiff's testimony at the hearing before ALJ Bukes that she has never

27

Similarly, the Court cannot find a single reference in the
administrative record in this case to support ALJ Bukes' finding
that Plaintiff is a malingerer.  Rather, this finding appears to
be based on impermissible speculation by ALJ Bukes.[34]  See
Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)(An ALJ may not
make speculative conclusions without any supporting evidence).

    Regarding ALJ Bukes' finding that Plaintiff was "less than
credible" because she appeared to be processing her application
for secondary gain, he explained the basis for this finding as
follows: "I further note that the claimant's onset date was June
8, 2000.  I note further, that she first sought treatment at
Human Services on August 24, 2000; the claimant appears to be
processing her application herein for secondary gain."  (R. 22).
Initially, the Court notes its inability to locate the August 24,
2000 medical record on which ALJ Bukes relied in making this
finding.  Moreover, this finding is contradicted by the mental

_____

missed a day of taking the medications prescribed for her
depression and anxiety.  (R. 48).

[34]Regarding the issue of malingering, the Court notes that
the MMPI-2 is an evaluative test with a built-in mechanism to
detect whether a claimant is faking.  See Ross v. Shalala, 865
F.Supp. 286 (W.D.Pa.1994).  The MMPI-2 was administered to
Plaintiff as part of the neuropsychological evaluation performed
by Drs. Meyer and Uran on October 4, 2000, and resulted in the
following finding: "significant emotional distress is suggested
with symptomatology including depression, anxiety, agoraphobia,
difficulties involving anger modulation and negligible esteem."
(R. 140).  There is no notation in the report of the evaluation
that Plaintiff appeared to be faking or malingering with respect
to her mental impairments.

28

health questionnaire completed by Dr. Gomez, Plaintiff's family physician, on December 12, 2000 in connection with Plaintiff's initial applications for DIB and SSI. Specifically, in that questionnaire, Dr. Gomez indicated that he had last seen Plaintiff in August 2000 and that she had been complaining of panic attacks when she left her house for "the past few months." (R. 160). In any event, the onset date of disability alleged in connection with Plaintiff's current applications for DIB and SSI is January 22, 2002. ALJ Bukes erred in focusing on the onset date of disability alleged in Plaintiff's initial applications for DIB and SSI, rather than January 22, 2002, and there is an abundance of evidence regarding Plaintiff's treatment for depression and panic attacks before January 2002.

In connection with ALJ Bukes' finding that Plaintiff was "less than credible" because she did not appear motivated to work as evidenced by the fact that she was fired from her employment in 1999, the only evidence in the administrative record regarding Plaintiff's termination by Prism Technology in June 1999 is (1) Plaintiff's testimony that she was fired due to excessive absenteeism as a result of her fear of leaving the house (R. 44); (2) Plaintiff's representation in the Daily Activities Questionnaires completed in December 2000 and March 2002 that she was fired in 1999 for attendance problems due to panic attacks and for performance problems (R. 126, 283-84); (3) Plaintiff's

29

report to the Medical Review Team in January 2001 that she failed
in the workplace due to limited cognitive abilities, depression
and panic disorder (R. 250); (4) Plaintiff's representation in an
Adult Disability Report completed in January 2002 that she was
fired from her job in 1999 because she did not feel safe leaving
her house (R. 259); and (5) Plaintiff's report to Dr. Mercatoris,
who conducted the consultative psychological evaluation of
Plaintiff in May 2002, that she lost two jobs due to non-
attendance as a result of her depression and panic disorder (R.
313). In finding that Plaintiff did not appear motivated to work
as evidenced by her termination in 1999, ALJ Bukes, again,
engaged in impermissible speculation. There is simply no
evidence to support this finding.

Finally, regarding ALJ Bukes' finding that Plaintiff was
"less than credible" because the limitations alleged by Plaintiff
were not supported by the sporadic treatment she had received for
her mental impairments, a review of the administrative record in
this case shows that Plaintiff has taken various medications in
an attempt to alleviate her depression and panic attacks since
2000, and that she sees a psychiatrist, as well as a therapist,
on a regular basis. Under the circumstances, the Court concludes
that ALJ Bukes' characterization of Plaintiff's mental health
treatment as sporadic is not supported by substantial evidence.

ii

In finding that Plaintiff retained the RFC to perform work existing in significant numbers in the national economy, ALJ Bukes stated that he gave "little weight" to the opinion of Plaintiff's treating psychiatrist, Dr. Qureshi, concerning the limitations on Plaintiff's ability to engage in substantial gainful activity as a result of her mental impairments which were set forth in the March 26, 2002 medical assessment and the July 12, 2003 medical source statement.  (R. 303-05, 361-62). Plaintiff maintains that ALJ Bukes erred by not giving controlling weight to Dr. Qureshi's opinion in accordance with 20 C.F.R. § 404.1527.[35]  After consideration, the Court agrees.

In determining that Plaintiff retained the RFC to perform work existing in significant numbers in the national economy, ALJ Bukes relied heavily on the mental health questionnaire completed by Plaintiff's family physician, Dr. Gomez, on March 26, 2002. In so doing, the Court concludes that ALJ Bukes erred.  Although Dr. Gomez and Dr. Qureshi are both treating physicians in this case, as a mental health specialist who had treated Plaintiff

_____

[35]20 C.F.R. § 1527(d)(2) provides, in relevant part, that controlling weight will be given to a treating source's opinion on the issue of the nature and severity of a Social Security claimant's impairments when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."

over a lengthy period of time, the opinion of Dr. Qureshi
concerning Plaintiff's work-related mental limitations was
entitled to significantly more weight than the opinion of Dr.
Gomez, whose specialities are family medicine and emergency
medicine. See 20 C.F.R. § 404.1527(d)(5); Mason v. Shalala, 994
F.2d 1058, 1067 (3d Cir.1993)(The opinion of a medical specialist
is entitled to greater deference than a conflicting opinion by a
non-specialist); Ross v. Shalala, 865 F.Supp. 286
(W.D.Pa.1994)(ALJ erred in giving more weight to testimony of
medical doctor than to testimony of practicing psychologist in
determining that claimant did not suffer from disability which
enabled her to receive SSI; testimony of psychologist was
acceptable medical source for determination of disability while
physician was totally unqualified to diagnose psychological
disorders, and it was incumbent upon ALJ to articulate how other
evidence from qualified individuals permitted him to reject
opinion of psychologist). This is especially true where, as
here, the evidence establishes that Dr. Gomez's treatment of
Plaintiff has been sporadic and, for the most part, unrelated to
her depression and panic attacks.[36]

---

[36]In this regard, it is interesting to note that in the
mental health questionnaire completed by Dr. Gomez in connection
with Plaintiff's initial applications for DIB and SSI on December
12, 2000, the doctor specifically stated that he had no knowledge
of Plaintiff's activities of daily living, and he did not
complete the questionnaire with respect to Plaintiff's social

.   .

Next, ALJ Bukes stated that he gave "little weight" to the
opinion of Dr. Qureshi concerning Plaintiff's work-related mental
limitations because the opinion was based on the doctor's
acceptance of Plaintiff's subjective allegations which ALJ Bukes
found to be "less than credible." As noted above in Section
IV(B)(i) of this Memorandum Opinion, ALJ Bukes' credibility
determination in this case was tainted by legal error and
otherwise unsupported by substantial evidence. As a result, the
credibility of Plaintiff's subjective allegations was not a
proper basis for discounting Dr. Qureshi's findings.[37]

---

functioning and concentration, persistence and pace. Yet, with
no apparent change in the treatment relationship, Dr. Gomez
opined in the subsequent mental health questionnaire completed on
March 26, 2002 that Plaintiff had no difficulties in activities
of daily living, social functioning or concentration, persistence
or pace.

[37]With respect to ALJ Bukes' criticism of Dr. Qureshi's
reliance on Plaintiff's subjective allegations, the Court also
notes that in <u>Worzalla v. Barnhart</u>, 311 F.Supp.2d 782
(E.D.Wis.2004), the ALJ denied a claimant's application for
disability benefits, criticizing a psychologist's reliance on the
claimant's subjective allegations. In addressing this issue, the
district court stated in relevant part:

                    *    *    *

   Finally, the ALJ stated that Dr. King was not being
   objective, instead accepting plaintiff's claims at face
   value.  This is incorrect. Dr. King relied on a battery of
   tests in reaching her conclusions. Further, doctors are
   allowed to rely on their patients' descriptions of their
   conditions.  <u>See</u> <u>Brown v. Barnhart</u>, 298 F.Supp.2d 773, 792-
   93 (E.D.Wis.2004).  How else is a psychologist to evaluate a
   patient's mental illness, other than talking to him?
   Depression does not show on an x-ray.  As a professional,
   Dr. King is presumably trained to scrutinize patient

33

        In connection with his decision to give "little weight" to

the opinion of Dr. Qureshi regarding Plaintiff's work-related

mental limitations, ALJ Bukes also stated that, in any event, the

RFC attributed to Plaintiff included the limitations set forth in

the medical assessment completed by Dr. Qureshi on March 26,

2002.  As the following examples illustrate, a comparison of ALJ

Bukes' RFC determination with the limitations set forth in the

medical assessment completed by Dr. Qureshi on March 26, 2002

does not support this finding:[38]

        (1) ALJ Bukes found that Plaintiff was limited to work

involving simple instructions, while Dr. Qureshi opined in the

March 26, 2002 medical assessment that Plaintiff was seriously

limited in her ability to understand, remember and carry out even

simple job instructions and to function independently and that

she had no useful ability to maintain attention/concentration;

_____

        statements.  The ALJ's implicit claim that she acted
        unprofessionally is without basis.  See Carradine, 360 F.3d
        at 755.

                                *    *    *

311 F.Supp.2d at 797.

        [38]In addition, the Court notes that the limitations contained
in ALJ Bukes' RFC determination cannot be construed as including
all of the marked limitations on Plaintiff's ability to perform
work-related mental activities which are set forth in the medical
source statement completed by Dr. Qureshi on July 12, 2003.  (R.
361-62).

                                     34

(2) ALJ Bukes found that Plaintiff could not be subjected to intensive supervision, while Dr. Qureshi opined in the March 26, 2002 medical assessment that Plaintiff had no useful ability to interact with supervisors; and

(3) ALJ Bukes found that Plaintiff must avoid having to perform at a competitive, production rate pace, while Dr. Qureshi opined in the March 26, 2002 medical assessment that Plaintiff had no useful ability to deal with work stresses.

(R. 18, 303-05).

Accordingly, ALJ Bukes' claim that his RFC determination incorporated all of Plaintiff's work-related mental limitations noted by Dr. Qureshi is meritless.

In discounting the opinion of Dr. Qureshi concerning the severity of Plaintiff's work-related mental limitations, ALJ Bukes also placed significant weight on the fact that Dr. Qureshi assigned a GAF score of 55 to Plaintiff on several occasions (denoting moderate symptoms or moderate difficulty in social, occupational and school functioning), which ALJ Bukes maintains is inconsistent with the severity of Plaintiff's work-related mental limitations set forth by Dr. Qureshi in the July 12, 2003 medical source statement. Specifically, ALJ Bukes stated:

"Again, I give very little weight to the opinion of the treating physician Dr. Gomez (sic). This is supported not only by the fact that, as noted above, the claimant's overall testimony and processing of this application leads me to believe that she is less than credible, but also by

35

.    .

the fact that Dr. Gomez's (sic) findings are inconsistent
with each other, which thereby renders them ambiguous, and
which thus renders them less than credible.   Indeed, Dr.
Gomez (sic) finds that the claimant has a GAF of as high as
55, which, again, indicates that the claimant has only
moderate limitations, it is entirely inconsistent for him to
find that the claimant has marked limitations in work-
related categories.   Indeed, I tend to give greater weight
to the GAF finding of 55 than the marked limitations, since
the GAF is a comprehensive overall score, which requires
that the doctor to (sic) contemplate, and use independent
thought processes, which I find to be a greater, and more
accurate, measure of his thinking than simply his check
marks in blocked categories.   Thus, I have given greater
weight to Dr. Gomez's (sic) findings of a GAF of 55."[39]

(R. 20-21).

As an initial matter, the Court does not agree with ALJ Bukes

that assigning a GAF score requires greater thought or

contemplation than completing a medical source statement

containing a detailed list of specific work-related mental

limitations.   Indeed, in the Court's view, a more accurate

assessment of a claimant's work-related mental limitations would

be obtained by asking his or her treating mental health expert to

delineate the specific work-related limitations resulting from

the claimant's mental impairments than simply assigning a GAF

score which denotes the claimant's overall psychological

functioning.   In any event, an ALJ is not free to employ his or

her own expertise against that of a physician who presents

---

[39]Throughout the section of ALJ Bukes' decision addressing
Dr. Qureshi's records and reports, he repeatedly refers to Dr.
Qureshi as Dr. Gomez.   (R. 20-21).

competent medical evidence. See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir.1985);[40] see also Morales v. Apfel, 225 F.3d 310, 319 (3d Cir.2000)("The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability."). Thus, ALJ Bukes erred by disregarding the severity of Plaintiff's work-related mental limitations set forth by Dr. Qureshi in the July 12, 2003 medical source statement.[41]

In summary, because Dr. Qureshi's opinion concerning the severity of Plaintiff's work-related mental limitations was well supported by neuropsychological testing (R. 136-44) and consultative psychological evaluation (R. 306-15) and not inconsistent with other substantial evidence in the administrative record, ALJ Bukes should have accorded controlling weight to Dr. Qureshi's opinion.

_____

[40]Another example of ALJ Bukes employing his own medical expertise is reflected in the following statement in his December 23, 2004 decision: "I note that, and I am taking administrative notice here, that the claimant was only on a small dosage of Xanax (.5 mg) and Celexa for depression."

[41]In this connection, the Court notes that Drs. Meyer and Uran also assigned a GAF score of 55 to Plaintiff following her neuropsychological evaluation in October 2000, despite diagnostic findings indicating the presence of numerous, significant limitations which would affect Plaintiff's ability to engage in substantial gainful activity on a regular and continuing basis.

37

iii

The Court also agrees with Plaintiff's assertion that ALJ Bukes engaged in "selective application of medical evidence" and failed to discuss certain relevant evidence in the record. (Pl's Brief, pp. 12, 18). With respect to the issue of selective application of medical evidence, "it is clear that the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." Loza v. Apfel, 219 F.3d 378, 393-94 (5th Cir.2000)(citations omitted). In support of his adverse decision in the present case, ALJ Bukes cited the report of Dr. Mercatoris who performed the consultative psychological evaluation of Plaintiff on May 29, 2002 at the request of the Pennsylvania Bureau of Disability Determination. Specifically, ALJ Bukes noted that his RFC determination encompassed Dr. Mercatoris' findings that Plaintiff had no useful ability to deal with the public or understand, remember and carry out complex job instructions because he limited Plaintiff to work involving simple tasks and work in which contact with the general public would be avoided. However, ALJ Bukes' RFC determination does not encompass Dr. Mercatoris' additional findings that Plaintiff was seriously limited in her ability to follow work rules, maintain attention/concentration, behave in an emotionally stable manner and demonstrate reliability. (R. 314-15). Moreover, ALJ Bukes totally fails to mention Dr. Mercatoris'

38

opinion that Plaintiff would not be able to maintain regular attendance as a result of her mental impairments, which negates an ability to engage in substantial gainful activity on a regular and continuing basis as required by Social Security law.

As to the issue of failing to address relevant evidence in the record, ALJ Bukes fails to discuss the letter of Patricia Sipple, an Administrative Case Manager with Crawford County Human Services, who opined in February 2003 that Plaintiff could not consistently engage in work-related activity or fulfill the expectations required to maintain gainful employment. (R. 368). As noted by Plaintiff, although this letter was not written by a medical source, it was nevertheless entitled to consideration by ALJ Bukes.[42]  See Social Security Ruling 96-7p.[43]

---

[42]In this regard, the Court also notes that although ALJ Bukes relied on the prior adverse decision of ALJ Kozma in denying Plaintiff's current applications for DIB and SSI, he did not discuss the report of Plaintiff's neuropsychological evaluation which was performed by Drs. Meyer and Uran in October 2002 in connection with Plaintiff's earlier applications for DIB and SSI.  Importantly, the report substantiates Plaintiff's complaints of depression and anxiety, and, as noted previously, Drs. Meyer and Uran opined that Plaintiff's vocational success was contingent on her attainment of further emotional stability and there is no evidence that Plaintiff's mental impairments improved between the date of the neuropsychological evaluation and ALJ Bukes' adverse decision.

[43]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).  Social Security Ruling 96-7p provides in relevant part:

In determining the credibility of the individual's

Finally, the Court agrees with Plaintiff that ALJ Bukes' hypothetical question to the VE did not contain all of her work-related mental limitations which were supported by the medical evidence in this case. As a result, the VE's response to the hypothetical question did not constitute substantial evidence supporting ALJ Bukes' adverse decision. See Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir.2004)(ALJ's hypothetical question to VE did not accurately convey all of Social Security disability claimant's impairments and the limitations they caused, and, therefore, the ALJ's decision denying benefits was not supported by substantial evidence).

**V. Conclusion**

In sum, Social Security Ruling 85-15 provides in relevant part:

Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out,

statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists *and other persons* about the symptoms and how they affect the individual, and *any other relevant evidence in the case record.* (Emphasis added).

and remember simple instructions; to respond appropriately
to supervision, coworkers, and usual work situations; and to
deal with changes in a routine work setting.  *A substantial*
loss of ability to meet any of these basic work-related
activities would severely limit the potential occupational
base.  This, in turn, would justify a finding of disability
because even favorable age, education, or work experience
will not offset such a severely limited occupational base.

In the present case, there is overwhelming evidence from both

treating and consulting mental health experts that Plaintiff's

impairments prevent her from performing, on a sustained basis,

the basic mental demands of competitive work set forth in Social

Security Ruling 85-15.  Accordingly, the Commissioner's decision

denying Plaintiff's applications for DIB and SSI will be

reversed.

William L. Standish
United States District Judge

Date: June 19 2007